1
2
3
4
5
6
7
8            IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10   MAI-HOA T. HUYNH,

11            Plaintiff,                    No. CIV S-06-0920 GGH

12      vs.

13   MICHAEL J. ASTRUE,[1]
     Commissioner of Social Security,           ORDER
14
             Defendant.
15   _____/

16            Plaintiff seeks judicial review of a final decision of the Commissioner of Social

17   Security ("Commissioner") denying plaintiff's application for Supplemental Security Income

18   ("SSI") under Title XVI of the Social Security Act ("Act").  For the reasons that follow,

19   plaintiff's Motion for Summary Judgment is DENIED, the Commissioner's Cross Motion for

20   Summary Judgment is GRANTED.

21   BACKGROUND

22            Plaintiff, born October 4, 1948, protectively filed an application for Supplemental

23   Security Income payments on November 21, 2002.  (Tr. at 17, 65.)  Plaintiff alleges disability

24   _____

25       [1] On February 12, 2007, Michael J. Astrue was sworn in as Commissioner of Social
     Security, replacing Jo Anne B. Barnhart, the original defendant herein. Pursuant to 42 U.S.C. §
     405(g) and Fed. R. Civ. P. 25(d)(1), Michael J. Astrue is substituted as the defendant in this
26   action.

beginning January 1, 2000, due to "mental health." (Tr. at 90.) Plaintiff's claim was initially

heard on May 26, 2004, by administrative law judge ("ALJ") Antonio Acevedo-Torres, who

found that plaintiff was not disabled. (Tr. 53-57.) The Appeals Council vacated that decision

and remanded the case for further consideration. (Tr. 328-30.) The Appeals Council instructed

the ALJ to obtain updated medical evidence, give further consideration to the treating and

examining source opinions, further evaluate the claimant's subjective complaints and provide

rationale in accordance with the disability regulations pertaining to evaluation of symptoms,

assess the credibility of any third party witness testimony or reports, obtain medical expert

opinion as necessary, and further evaluate plaintiff's mental impairments in accordance with the

regulations by providing specific findings and appropriate rationale. (Tr. 328-30.)

       A second hearing was held on June 8, 2005, before the same ALJ. Plaintiff, who

was represented by counsel, testified at the hearing with the aid of an interpreter. Plaintiff's

daughter also testified, as did Dr. Sydney Walter, Ph.D., an expert in clinical psychology.

       In a decision dated September 15, 2005, the ALJ determined that the plaintiff was

not disabled. The ALJ made the following findings:[2]

---

[2] Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq. Supplemental Security Income is paid to disabled persons with low income. 42 U.S.C. § 1382 et seq. Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A). A parallel five-step sequential evaluation governs eligibility for benefits under both programs. See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987). The following summarizes the sequential evaluation:

       Step one: Is the claimant engaging in substantial gainful activity? If so, the claimant is found not disabled. If not, proceed to step two.
       Step two: Does the claimant have a "severe" impairment? If so, proceed to step three. If not, then a finding of not disabled is appropriate.
       Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1? If so, the claimant is automatically determined disabled. If not, proceed to step four.

1.      The claimant has not engaged in substantial gainful activity
        since the alleged onset of disability.

2.      The claimant's mood disorder secondary to head injury and
        depressive disorder are considered mild to moderate based
        on the requirements in the Regulations 20 CFR §
        416.920(c).[3]

3.      These medically determinable impairments do not meet or
        medically equal one of the listed impairments in Appendix
        1, Subpart P, Regulation No. 4.

4.      The undersigned finds the claimant's allegations regarding
        her limitations are not totally credible for the reasons set
        forth in the body of the decision.

5.      The claimant retains the residual functional capacity for
        work at all exertional levels.  The claimant does have
        nonexertional mental limitations that preclude working
        with more than simple and repetitive tasks.

6.      The claimant has no past relevant work (20 CFR §
        416.965).

7.      The claimant is an "individual of advanced age" (20 CFR §
        416.963).

8.      The claimant is "illiterate" (20 CFR § 416.964).

9.      The claimant has no transferable skills from any past
        relevant work and/or transferability of skills is not an issue
        in this case (20 CFR § 416.968).

---

        Step four:  Is the claimant capable of performing his past
work?  If so, the claimant is not disabled.  If not, proceed to step
five.
        Step five:  Does the claimant have the residual functional
capacity to perform any other work?  If so, the claimant is not
disabled.  If not, the claimant is disabled.
Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

        The claimant bears the burden of proof in the first four steps of the sequential evaluation
process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
burden if the sequential evaluation process proceeds to step five.  Id.

        [3] The court notes that although the ALJ did not explicitly set forth in this section a finding
that plaintiff's impairments were severe, 20 CFR § 416.920(c), the body of his decision reflects
such a finding.  (Tr. 22.)

10.     The claimant has the residual functional capacity to perform substantially all of the full range of heavy work (20 CFR § 416.967).

11.     Based on an exertional capacity for heavy work, and the claimant's age, education, and work experience, Medical-Vocational Rule 204.00, Appendix 2, Subpart P, Regulations No. 4 would direct a conclusion of "not disabled."

12.     The claimant's capacity for heavy work is substantially intact and has not been compromised by any nonexertional limitations.  Accordingly, using the above-cited rule(s) as a framework for decision-making, the claimant is not disabled.

13.     The claimant was not under a "disability" as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(g)).

(Tr. at 25-26.)

ISSUES PRESENTED

Plaintiff has raised the following issues: A. Whether the ALJ's decision regarding residual functional capacity has "any supporting rationale or basis in the evidence"; B. Whether the ALJ's step three residual functional capacity determination has "any supporting rationale or basis in the evidence"; and, C. Whether the ALJ erred in "handling plaintiff's and her children's input."[4]

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

_____

[4] Plaintiff does not raise as an issue use of the grids by the ALJ in lieu of use of a vocational expert, despite record evidence of a mental/emotional impairment, and a non-exertional  impairment which the ALJ found limited plaintiff's work ability in part.  While the undersigned will, at times, raise a point of law within an issue which the undersigned believes should have been part of a discussion, the undersigned will not raise an omitted issue itself.   Use of the grids as an issue, assuming it has merit, has been waived.

Moreover, no party argues that plaintiff had physical (exertional) impairments that affected her ability to perform work at any level.  The court accepts the undisputed fact that plaintiff was physically able to perform work in the "heavy" category.

4

1   the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).

2   Substantial evidence is more than a mere scintilla, but less than a preponderance.  Saelee v.

3   Chater, 94 F.3d 520, 521 (9th Cir. 1996).  "'It means such evidence as a reasonable mind might

4   accept as adequate to support a conclusion.'"  Richardson v. Perales, 402 U.S. 389, 402, 91 S. Ct.

5   1420 (1971) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229, 59 S. Ct. 206

6   (1938)).  "The ALJ is responsible for determining credibility, resolving conflicts in medical

7   testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir.

8   2001) (citations omitted).  "Where the evidence is susceptible to more than one rational

9   interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld."

10  Thomas v. Barnhart, 278  F.3d 947, 954 (9th Cir. 2002).

11  ANALYSIS

12              A.  Residual Functional Capacity Determination

13              Plaintiff alleges the ALJ's determination of her residual functional capacity

14  ("RFC") is unsupported by rationale or evidence, and was "just a prescription for denial."

15  (Plaintiff's Reply Brief, at 3:2-3.)

16              Residual functional capacity is what a person "can still do despite [the

17  individual's] limitations."  20 C.F.R. § 416.945(a) (1996); see also Valencia v. Heckler, 751 F.2d

18  1082, 1085 (9th Cir. 1985) (residual functional capacity reflects current "physical and mental

19  capabilities").  Social Security Ruling 96-8p ("SSR 96-8p") sets forth the policy interpretation of

20  the Commissioner for assessing residual functional capacity.  SSR 96-8p; see Silveira v. Apfel,

21  204 F.3d 1257, 1260 (9th Cir. 2000) ("This court defer[s] to Social Security Rulings ... unless

22  they are plainly erroneous or inconsistent with the Act or regulations").  SSR 96-8p states that in

23  assessing RFC, the "adjudicator must consider all allegations of physical and mental limitations

24  or restrictions and make every reasonable effort to ensure that the file contains sufficient

25  evidence to assess RFC."  SSR 96-8p. "The RFC assessment must be based on all of the relevant

26  evidence in the case record, such as: medical history, medical signs and laboratory findings, the

1    effects of treatment . . ., reports of daily activities, lay evidence, recorded observations, [and]

2    medical source statements. . . ." Id.

3            Here, the ALJ found plaintiff suffered from "mood disorder secondary to head

4    injury and depressive disorder."[5]  (Tr. 25.)  In light of these impairments, the ALJ concluded that

5    plaintiff "retains the residual functional capacity for work at all exertional levels, reduced by

6    mental limitations that preclude working with more than simple repetitive tasks."  (Tr. at 23.)  In

7    reaching this conclusion, the ALJ credited the medical findings, opinions, and diagnostic

8    conclusions of plaintiff's treating and examining physicians.  (Tr. 23.)  In particular, he relied on

9    the progress notes from plaintiff's treating physicians evidencing improvement and stabilization

10   as to her mental impairments and symptoms.   The ALJ also attached significant weight to the

11   opinions of examining professionals Dr. Tim Canty, M.D., and Dr. Janice Nakagawa, Ph.D., as

12   well as that of medical expert Dr. Walter.  The ALJ properly considered plaintiff's allegations

13   regarding her purported limitations, including her claims that she has poor memory, trouble

14   sleeping, difficulty thinking, and auditory hallucinations of cracking sounds in her head.  (Tr. 22.)

15   The ALJ found plaintiff's statements concerning her impairments and their impact on her ability

16   to work to be less than credible in light of the "rather strong indicators of malingering laden

17   within in the record."  (Tr. 23.)

18           Indeed, the ALJ's determination of plaintiff's RFC was influenced by this

19   credibility finding.  The ALJ determines whether a disability applicant is credible, and the court

20   defers to the ALJ's discretion if the ALJ used the proper process and provided proper reasons.

21   See, e.g., Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ

22   must make an explicit credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir.

23   1990); Rashad v. Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility

24

25           [5] The record shows that plaintiff sustained a head injury while living in Vietnam about
     twenty years ago.  (Tr. 234, 372, 383-84.)  However, she did not stop working until early 2000
26   due to "mental health." (Tr. 90.)

1  finding to be supported by "a specific, cogent reason for the disbelief").

2          Here, the ALJ made the required and explicit finding as to credibility:

3          [T]he claimant's statements and reports, as well as her children's
           statements and reports, concerning her impairments and their impact on
4          her ability to work are not entirely credible in light of inconsistencies and
           the rather strong indicators of malingering laden within the record.
5          Specifically, the undersigned finds the allegations of the claimant and
           especially her daughter to be contrary to the documented reports of
6          stabilization and improvement on medication in the progress notes of
           record, many of which were reported by the claimant as interpreted by her
7          daughter.  Furthermore, both Dr. Canty and Dr. Nakagawa advised that the
           clamant was likely malingering for monetary gain.

8

9  (Tr. at 21.)

10         In assessing credibility, the ALJ may consider objective medical evidence,

11 claimant's treatment history, daily activities, work record, and observations of physicians and

12 third parties with personal knowledge about the claimant's functional limitations.  Smolen v.

13 Chater, 80 F.3d 1273, 1283-84 (9th Cir. 1996).  In addition, the ALJ may employ ordinary

14 techniques of credibility evaluation such as prior inconsistent statements concerning symptoms

15 and statements by the claimant that appear to be less than candid.  Id.; 20 C.F.R. § 404.1529;

16 SSR 96-7p.  The ALJ must make findings that are "sufficiently specific to permit the reviewing

17 court to conclude that the ALJ did not arbitrarily discredit the claimant's testimony."  Orteza v.

18 Shalala, 50 F.3d 748, 750 (9th Cir. 1995).   The ALJ's findings are entitled to deference if they

19 are "properly supported by substantial evidence" and are "sufficiently specific to allow a

20 reviewing court to conclude the adjudicator rejected claimant's testimony on permissible grounds

21 . . . ."  Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991) (en banc).

22         Absent affirmative evidence suggesting malingering, the ALJ must provide clear

23 and convincing reasons for discrediting a claimant's testimony regarding the severity of her

24 symptoms.  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999);

25 Smolen, 80 F.3d at 1283-84.  Here, as noted by the ALJ, there was affirmative evidence

26 suggesting malingering, i.e., Dr. Nakagawa's opinion to that effect, as well as the opinions of

1   Drs. Canty and Walter suggesting that malingering was strong possibility.[6]  Even with this

2   evidence, the ALJ gave clear and convincing reasons for finding plaintiff less than credible.

3   Specifically, the ALJ cited to the consultative evaluations preformed by examining professionals,

4   Drs. Canty and Nakagawa.  (Tr. 20.)

5           Dr. Canty noted plaintiff's poor performance on various tests (giving no response

6   when asked: how an apple and orange are similar; what she would do if she were at home and her

7   house caught on fire; and, the answer to 20 minus 3).  (Tr. 191.)  Dr. Canty commented that it

8   was unclear whether plaintiff was "unwilling or unable" to perform these tasks and indicated that

9   plaintiff was possibly malingering.  (Tr. 191-92.)

10          Dr. Nakagawa twice opined that plaintiff was malingering.  After evaluating

11  plaintiff on July 29, 2003, Dr. Nakagawa wrote that:

12          [C]laimant was virtually nonresponsive even to the simplest questions.
            Eventually, when she was asked why she applied for disability benefits,
13          she said she did not have any money.  She did not respond by talking about
            any physical problems despite repeated questions about why she applied
14          for disability and whether she had any medical problems. . . . [T]here was
            clear evidence of inconsistencies in the way she responded to questions
15          and directions that suggested malingering.  For example, she was asked to
            count from 1 to 5. . . .  She started with the numeral 1; she was asked what
16          came after 1, and she said it was 5.

17  (Tr. 193-94.)

18          Dr. Nakagawa further commented that plaintiff "did not know how many children

19  she had and made inconsistent statements, saying she did not know whether she had a daughter.

20  At another point, she said she had a daughter."  (Tr. 195.)  Dr. Nakagawa examined plaintiff

21  again on February 24, 2005, and concluded that plaintiff "was attempting to present in the worst

22          ──────────────────

23          [6]  Contrary to plaintiff's assertions that no doctor concluded she was malingering for
     monetary gain, Dr. Nakagawa affirmatively indicated that plaintiff was malingering, which, by
24   definition, implies a motivation for some kind of gain, financial or otherwise.  See DSM IV, at
     739 ("The essential feature of malingering is the intentional production of false or grossly
25   exaggerated physical or psychological symptoms, motivated by external incentives such as . . .
     avoiding work, obtaining financial compensation. . . .").  Dr. Nakagawa commented that "[it] was
26   evident that she was attempting to present in a very negative way for secondary gain, i.e.,
     malinger."  (Tr. 347.)

1   possible light and was malingering." (Tr. 347.)   At that exam, Dr. Nakagawa found plaintiff's

2   responses to various tests to be "so blatantly outrageous" that she concluded "they firmly

3   suggested malingering." (Tr. 20, 347.)  In response to one test question, plaintiff responded that

4   a bird had four legs. (Tr. 346.)  Further, Dr. Nakagawa noted that "[t]here were very long delays

5   in her responses, but when she did respond, her speech was relevant and coherent.  The manner

6   in which she responded suggested she was much more aware of English.  For example, she

7   would respond to questions before the interpreter managed to interpret what was being asked."

8   (Tr. 346.)

9          The ALJ further found that the record showed plaintiff's stabilization and

10   improvement on medication.  (Tr. 20.)  The ALJ's finding in this regard was supported by

11   substantial evidence in the record, as noted by his citation to numerous progress notes from 2001

12   through early 2005.  Those progress notes reflect that plaintiff reported to her treating physicians,

13   Dr. Arun Seeley, M.D. and Dr. George F. Graman, M.D., either generally positive responses to

14   adjustments in her medication and overall stability as to her condition.  (Tr. 21, 30, 32, 185, 182,

15   181, 340-43.)  The ALJ attached significant weight to the fact that at one point, plaintiff found

16   her condition stabilized to the point that she wished to discontinue her medications, and that Dr.

17   Seeley then decreased her Zoloft dosage by half.  (Tr. 21, 180.)  Similarly, the ALJ pointed to a

18   progress note made by Dr. Graman on April 11, 2005, showing plaintiff  "denie[d] being

19   depressed," commented that "everything is stable in her life," and reported that "her current

20   mediation [*sic*] regimen . . . is useful in controlling her mood and thought disorder."  (Tr. 21, 30.)

21          In addition to considering plaintiff's medical records, medical source statements,

22   recorded observations, and the effects of plaintiff's treatment to determine plaintiff's RFC, the

23   ALJ also considered the testimony of plaintiff's daughter, as well as reports completed by her son

24   and daughter.

25          An ALJ may discredit the testimony of a lay witness if he gives reasons that are

26   germane to each witness.  Smolen v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996).  "One reason

9

1   for which an ALJ may discount lay testimony is that it conflicts with medical evidence." <u>Lewis v.</u>

2   <u>Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001) (citing <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th

3   Cir. 1984)).  Here, the only lay witness who actually testified was plaintiff's daughter.  (Tr. 368-

4   75, 382-90.)  Although the ALJ noted that there is "a consensus among the claimant and her

5   family that she pretty much can not [*sic*] finish any tasks or follow directions" he discredited

6   these reports based on medical evidence showing that plaintiff's condition improved with

7   medication and based on medical opinions that plaintiff was malingering.  (Tr. 23.)  The ALJ

8   gave specific and germane reasons for discrediting the testimony of plaintiff's daughter (and the

9   reports of her son), namely, by pointing to medical evidence showing plaintiff's mental

10  impairments were much less severe than she and her family reported.

11          Taking all the above-noted evidence into account, the ALJ concluded that plaintiff

12  "retains the residual functional capacity to perform work at all exertional levels . . . [but] is

13  precluded from understanding, remembering and carrying out more than simple, repetitive tasks

14  or job instructions."  (Tr. 22.)  This limitation to simple, repetitive tasks was consistent with the

15  opinions of non-examining medical consultants, Dr. Lon Gottshchalk, M.D., and Dr. Susan

16  Regan, M.D., (Tr. 245, 256.).  Those opinions are in turn consistent with medical evidence from

17  plaintiff's treating physicians showing stability and improvement in her mental health, and with

18  the evaluations of examining professionals who found that plaintiff was likely exaggerating the

19  impact of her condition and limitations.  The ALJ's assessment was based on relevant evidence

20  in the record, including plaintiff's medical history, medical findings, the effects of treatment,

21  recorded observations, lay evidence, and medical source statements.  <u>See</u> SSR 98-6p.  The RFC

22  assessment was therefore supported by substantial evidence in the record.

23          The undersigned emphasizes that he has not found that plaintiff suffered from no

24  significant mental/emotional impairment.  The record demonstrates that plaintiff had complained

25  about depression and/or other mental illness, off and on, for a number of years.  <u>See</u> e.g., (Tr.

26  166, 226).  The point here is whether the ALJ properly found the level of severity of plaintiff's

1    problems, and whether potential malingering was a legitimate part of that analysis.  There was

2    substantial evidence, albeit not uncontradicted, that plaintiff exaggerated the severity of her

3    problems such that her ability to work was only partially affected.

4                    B.  The ALJ's Step Three Finding

5                    Next, plaintiff argues that the ALJ's step three finding lacks supporting rationale.

6    At step three of the disability analysis, the ALJ found that plaintiff's medically determinable

7    impairments (i.e., mood disorder secondary to head injury and depressive disorder) do not meet

8    or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

9    (Tr. 21-22.)

10                   The "Listing of Impairments" ("Listings") describe various impairments of

11   thirteen bodily systems, which presumptively preclude a person from working.  20 C.F.R. Pt.

12   404, Subpt. P, App. 1; see Young v. Sullivan, 911 F.2d 180, 183 (9th Cir. 1990); 20 C.F.R. §

13   404.1520(d).  At the third step of the disability analysis, the ALJ determines whether a person's

14   condition either "meets" or "equals" a listing.  The ALJ is "responsible for deciding the ultimate

15   legal question whether a listing is met or equaled.  As trier of the facts, and administrative law

16   judge or the Appeals Council is not bound by a State agency medical or psychological consultant

17   or other program physician or psychologist as to whether an individual's impairment(s) is

18   equivalent in severity to any impairment in the Listing of Impairments."  SSR 96-6p.

19                   Here, the ALJ determined that the symptoms associated with plaintiff's

20   impairments were indicative of an affective disorder, and therefore evaluated the question of

21   equivalency based on the criteria of section 12.04.  See 20 C.F.R. Pt. 404, Subpt. P, App.1.[7]  (Tr.

22

23           [7] Section 12.04 is the Listing for Affective Disorders, i.e., mental disorders characterized
     by prolonged disturbance of mood accompanied by a manic or depressive syndrome. The severity
24   requirements for Listing 12.04 are set forth in paragraphs A, B and C of the Listing. The claimant
     can satisfy the Listing by showing both the A and B criteria or by showing the C criteria.  20
25   C.F.R. § 404, Subpart P, Appendix 1, § 12.04.  The B criteria require the claimant to show that
     the affective disorder results in marked restrictions in two of four broad areas of function: (1)
26   activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and, (4)

1   20.)  Plaintiff claims that the ALJ's assessment of the "B" criteria lacks rationale and support in

2   the record.  (Plaintiff's Brief, at 9:12-16.)

3              In assessing the "B" criteria of section 12.04 as applied to plaintiff, the ALJ

4   concluded that "claimant has at most mild to moderate restrictions in her activities of daily

5   living, mild to moderate difficulty in maintaining social functioning, and mild to moderate

6   deficiencies of concentration, persistence, or pace . . . . [and that] there is no evidence that the

7   claimant has ever experienced repeated episodes of decompensation. . . ." (Tr. 21.)  Contrary to

8   plaintiff's assertions, the ALJ based these findings on evidence in the record, namely: "the

9   consultative examinations of record, the claimant's mental health progress notes and Dr. Walter's

10  expert medical testimony."  (Tr. 21.)

11             These sources relied on by the ALJ indicate that plaintiff was exaggerating the

12  limiting effects of her impairments, and was likely malingering.  Indeed, the ALJ's assessment

13  that plaintiff suffered only "mild to moderate" limitations in the "B" criteria is in line with those

14  opinions.

15             As discussed above, consultative evaluator, Dr. Nakagawa, declared that she was

16  unable to assess plaintiff's restrictions due to plaintiff's malingering.  (Tr. 348-50.)  The medical

17  expert, Dr. Walter, likewise declared that a "B" criteria evaluation was impossible, given

18  plaintiff's bizarre and exaggerated responses to testing.  (Tr. 392.)  Dr Walter testified that, "the

19  malingering tests do indicate that she was not cooperating or she was exaggerating or totally

20  withdrawing from answering, which is a form of malingering. . . . [S]he does not, according to

21  the doctors who examined her, had [sic] brain damage. Yet she's acting as if she has severe brain

22  damage as far as her behavior."  (Tr. 392.)  "For example, on the Tony II test, she scored zero

23  which is almost impossible to do unless someone totally did not want to cooperate and ignored

24  the tests.  Even brain damaged people have scores on the Tony III. . . .  Also, there were

25  _____

26  repeated episodes of decompensation of extended duration.  Id.

                                                    12

1   conflicting statements that she could not feed herself or dress herself.  Then another report later

2   on says she does feed and dress herself. . . ."  (Tr. 391.)

3          Dr. Canty was similarly ambivalent, noting that "based on the exam today,

4   [plaintiff] would not be able to work consistently, maintain regular work attendance or complete

5   a normal workday or workweek.  But, again, I think a thorough review of the records would be

6   more helpful as the claimant may have had a limited desire to participate in today's exam . . . ."

7   (Tr. 192.)

8          Indeed, the ALJ conducted a thorough review of plaintiff's medical records,

9   which he concluded showed that plaintiff's condition was relatively stable and improved with

10  medication.  (Tr. 21, 30, 32, 185, 182, 181, 340-43.)  Based on this evidence, the ALJ further

11  discounted plaintiff's statements regarding the limiting effects of her impairments.

12         Although none of the doctors relied on by the ALJ made an explicit finding that

13  plaintiff had "mild to moderate" limitations in the "B" criteria of section 12.04, the ALJ's finding

14  is nonetheless consistent with their opinions that plaintiff was exaggerating her symptoms.

15         Furthermore, the ALJ's step-three finding is consistent with the opinions of the

16  state agency medical consultants.  Contrary to plaintiff's argument that the ALJ rejected those

17  opinions wholesale, the ALJ in fact found them to be "consistent with and supported by the

18  substantial evidence of record as described above."  (Tr. 23.)  The ALJ only rejected a portion of

19  one of those opinions finding plaintiff had *moderate to marked* limitations maintaining

20  concentration, persistence or pace.  (Tr. 23.)

21         One medical consultant, Dr. Lon Gottschalk, M.D., found that plaintiff "is able to

22  maintain concentration, persistence and pace over a 40-hour workweek."  (Tr. 245, 272-82.)  The

23  other consultative examiner, Dr. Susan Regan, M.D., found plaintiff to have only a moderate

24  degree of limitation in her daily living activities, and in maintaining her social function.  (Tr.

25  268).  However, she did find plaintiff to have "marked" difficulties in maintaining concentration,

26  persistence, or pace.  (Tr. 268.)  This was the only portion of the opinion rejected by the ALJ, and

13

1  even if it had been credited, that finding alone would not dictate a conclusion that plaintiff met or

2  equaled the listing for section 12.04.  See 20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04 (A

3  claimant can satisfy the listing by showing both the A and B criteria or by showing the C criteria.

4  The B criteria require the claimant to show that the affective disorder results in *marked*

5  *restrictions in two of four broad areas of function*: (1) activities of daily living; (2) social

6  functioning; (3) concentration, persistence or pace; and, (4) repeated episodes of decompensation

7  of extended duration.) (emphasis added).

8          It is the role of the factfinder to determine which of several views is persuasive.

9  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) ("The ALJ is responsible for

10  determining credibility, resolving conflicts in medical testimony, and for resolving

11  ambiguities.").  Moreover, in making that determination, the opinions of examining physicians

12  are generally entitled to greater weight than those of non-examining physicians.  Id. at 1041.

13  Here, the ALJ attached substantial weight to the opinions of the examining professionals,

14  especially that of Dr. Nakagawa, who concluded that plaintiff was malingering.  The ALJ's

15  finding at step three was also based on the progress notes of plaintiff's treating physicians, which

16  indicated that plaintiff showed improvement with medication, and that plaintiff often presented

17  with a good mood, and even denied depression.  (See, Tr.  21, 30, 180-81, 341, 343.)  The ALJ's

18  determination at step-three is supported by rationale and substantial evidence in the record.  He

19  did not err in weighing the medical evidence to determine that plaintiff's impairments do not

20  meet or equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

21          C.  The ALJ Credibility Evaluations

22          Finally, plaintiff argues that the ALJ erred in "handling the input of claimant and

23  her children."  (Plaintiff's Brief, at 10:8-12).  However, in her reply brief, plaintiff declares that

24  this "argument is superfluous" to whether reversal is appropriate. (Plaintiff' Reply Brief, at 4:6-

25  \\\\\

26  \\\\\

7.)  In any event, as discussed in detail above, the ALJ's credibility analysis concerning plaintiff and her children was properly conducted and supported by substantial evidence in the record.

DATED: 6/19/07

/s/ Gregory G. Hollows

_____
GREGORY G. HOLLOWS
U.S. MAGISTRATE JUDGE

GGH:mb Huynh920.ord

15